# Supreme Court of Texas

---

No. 22-0844

---

The Board of Regents of the University of Texas System,
*Petitioner,*

v.

IDEXX Laboratories, Inc.,
*Respondent*

---

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

---

**Argued January 10, 2024**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

A contract is a written expression of the parties' intent. When that intent is in question, the text must be read "as a whole in light of the circumstances present when the contract was entered."[1] In this case, the court of appeals concluded that two royalty provisions in the parties' licensing agreement, one for 1% and the other for 2.5%, considered separately and in the abstract, could logically be read to apply to the

---

[1] *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).

same sales of goods. Viewing both interpretations as "equally reasonable", the court held the agreement to be ambiguous.[2]

But obviously, in negotiating their agreement, the parties must have intended that the provisions, for very different royalties, would apply in different and mutually exclusive situations. The differing interpretations are, as we recently described in another context, "merely the competing theories that the parties advanced about how to read *the text*".[3] Examining the royalty provisions in context and in light of the circumstances that produced them, we find no ambiguity. We therefore reverse and remand to the court of appeals to address the remaining issues.

## I

Lyme disease in humans is caused by the bacterium *Borrelia burgdorferi*, which is carried by certain ticks. A skin rash near the tick bite may indicate infection. Early symptoms include joint and muscle pain, headaches, fever, and fatigue. The disease isn't contagious; it's spread only through a tick bite. Most cases can be treated successfully with antibiotics. Without treatment, the disease can worsen and result in severe pain and impairment. Dogs can contract Lyme disease, but most cases are routine and asymptomatic, not requiring treatment.

Heartworm is a serious and often fatal disease in pets, mostly dogs, caused by a parasitic worm, *Dirofilaria immitis*, carried by mosquitoes. When an animal is infected, the worm resides in blood

---

[2] 683 S.W.3d 108, 110-111 (Tex. App.—Houston [14th Dist.] 2022).

[3] *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 385 (Tex. 2023).

vessels near the heart and lungs and multiplies, inhibiting breathing and blood flow. The disease isn't contagious; it's spread only through a mosquito bite.

Regularly administered prescription preventives can protect an animal from the parasite, but if given after the animal is infected, the medication can itself result in impairment and death. So it's important to determine whether a dog has heartworm disease before giving the dog a preventive, like a heartworm pill. The parasite's presence can be detected with a blood test.

IDEXX Laboratories, Inc. ("Labs") has long been involved in developing, manufacturing, and selling veterinary diagnostic tests, products, and services. Labs invented heartworm tests in the 1980s and in 1992 offered its first "SNAP" product, a single-use device to test a dog's blood quickly and easily for heartworm without laboratory processing. A small sample of blood is placed in one part of the device and a chemical solution in another. Then at the press of a button, the device snaps them together (hence the name). Within eight minutes, the result shows whether the dog has the antigen for heartworm.

The SNAP product was a success and quickly made Labs an industry leader in the market for heartworm tests. But its success and the seriousness of heartworm disease encouraged others to develop competing tests, prompting Labs to look for ways to distinguish its SNAP product. At one point, it added a test for a tickborne pathogen, *E. canis*, which causes ehrlichiosis,[4] calling the product the SNAP Canine

---

[4] Ehrlichiosis is an infection that affects cells of the immune system in dogs, cats, and people.

Combo. Continuing its diversification efforts, Labs sought to obtain an exclusive license to use a peptide newly discovered at Tulane University to test for Lyme disease. In the process, Labs learned that The University of Texas ("the University") had applied for a patent on the same peptide. To assure its exclusive use, Labs also obtained an exclusive license of the University's patent.

In determining the royalties it would pay, Labs discussed with the University the sorts of products it might develop by combining the Lyme disease test with tests for other tickborne diseases and Labs' flagship heartworm test. The parties attempted to assess what test combinations could be most profitably and successfully marketed. After much discussion and many proposals back and forth, the parties signed a lengthy patent license agreement in 2000 calling for royalties on three types of products depending on what tests were included. Boiled down to its essentials, paragraph 5.1(b) obligated Labs to pay quarterly, on net sales for products sold

(i) "to detect Lyme disease alone" — 4%;

(ii) "to detect Lyme disease in combination with one other veterinary diagnostic test . . . (for example, but not limited to, a canine heartworm diagnostic test . . .)" — 1%; and

(iii) "to detect Lyme disease in combination with one or more veterinary diagnostic products . . . to detect tick-borne disease(s)" — 2.5%.[5]

---

[5] Paragraph 5.1(b) stated:

In consideration of rights granted by Board [of Regents of The University of Texas System] to IDEXX under this Agreement, IDEXX agrees to pay . . . a running royalty as follows:

The 1% royalty under (b)(ii) was to be shared equally with Tulane. The 2.5% royalty under (b)(iii) was not. The University's patent was to expire in 2017.

Shortly after executing the agreement, Labs introduced its first SNAP product testing for Lyme disease, adding that test to its SNAP Canine Combo. SNAP3Dx tested for Lyme disease and *E. canis*, two tickborne diseases, as well as mosquito-borne heartworm. Over the years, Labs marketed two other SNAP products. The first added a test for another tickborne disease and the second added tests for two more.[6] Thus, these three SNAP products test for Lyme disease with one, two, or four other tickborne diseases, and all test for mosquito-borne heartworm. None of the products test for a non-tickborne disease other

---

i. Four percent (4.0%) of Net Sales for all Licensed Products Sold to detect Lyme disease alone.

ii. One percent (1.0%) of Net Sales for all Licensed Products Sold to detect Lyme disease in combination with one other veterinary diagnostic test or service (for example, but not limited to, a canine heartworm diagnostic test or service). Such royalty rate shall be reduced by a percentage rate equal to the percentage rate paid to a third party, other than sublicensees and Affiliates, for products or components used by IDEXX exclusively in the production or Sale of the Licensed Product, However, the total reduction of the royalty rate shall not exceed one-half percent (0.5%).

iii. Two and one-half percent (2.5%) of Net Sales for all Licensed Products Sold as a product or service to detect Lyme disease in combination with one or more veterinary diagnostic products or services to detect tick-borne disease(s).

[6] SNAP4Dx added a test for tickborne *E. equi*, which also causes ehrlichiosis. SNAP4Dx Plus added tests for tickborne *E. ewingii*, another cause of ehrlichiosis, and *A. platys*, which causes anaplasmosis, a disease in the ehrlichiosis family.

than heartworm.

From the beginning, Labs paid, and the University accepted, a 0.5% royalty under (b)(ii) on sales of all three SNAP products.[7] Accompanying each quarterly payment was a report detailing the name of the product, the included tests, the number of sales, the royalty rate, and the royalty amount. In 2010, several years into the arrangement, Labs recognized that (b)(iii) could be read to apply to the SNAP products and require a much higher royalty because they all contained tests for Lyme disease and one or more other tickborne diseases. But (b)(iii) doesn't mention heartworm—(b)(ii) does—and (b)(ii)'s limitation to "Lyme disease in combination with one other . . . test" could be read to mean *one or more*. Labs never raised the issue with the University.

As the University's patent was expiring, it commissioned an audit of Labs' thirteen years of royalty payments. The audit found that net sales of SNAP products totaled more than $912 million and that Labs had paid 0.5% in royalties, some $4.5 million. The audit concluded that the royalty rate should have been 2.5% under (b)(iii) and that Labs owed over $18 million. In early 2018, the University sued Labs for unpaid royalties plus interest.

The parties filed cross-motions for partial summary judgment on the applicable royalty rate, each maintaining that the licensing agreement was clear and unambiguous. The trial court granted the University's motion and denied Labs'. In a series of summary-judgment

---

[7] Labs also sold a product, Lyme Quant C6 to test for Lyme disease alone and paid the 4% royalty under (b)(i). That product isn't at issue in this case.

rulings, the trial court rejected Labs' affirmative defenses[8] and concluded that the University was entitled to recover the unpaid royalties claimed plus $27 million in accrued interest at 18%, with interest continuing to accrue at $9,002 per day.

On appeal, Labs shifted its position on the royalty rate, arguing for the first time that the licensing agreement is ambiguous. In a brief opinion, the court of appeals agreed, reasoning as follows. All three SNAP products tested for heartworm, Lyme disease, and one or more other tickborne diseases. Thus, neither (b)(ii) nor (b)(iii) fit the SNAP products perfectly.

Subparagraph (b)(ii) would apply to all three if "Lyme in combination with one other test" means *at least one* or *one or more*, but not if the phrase means *one and only one*. Meanwhile, (b)(iii) would apply if "Lyme in combination with one or more tick-borne disease tests" doesn't exclude a heartworm test by not mentioning it—but would not apply if the phrase means tickborne tests and *nothing else* (i.e., no heartworm test). The court of appeals concluded that both interpretations are reasonable and conflicting, and therefore the royalty provisions are ambiguous. It reversed and remanded without reaching Labs' arguments that the licensing agreement didn't call for 18% interest on unpaid royalties and that its affirmative defenses shouldn't have been rejected as a matter of law.[9]

We granted the University's petition for review.

---

[8] Labs asserted several defenses, including limitations, estoppel, laches, waiver, and ratification.

[9] 683 S.W.3d at 111.

## II

"When a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument."[10] This venerable rule has long been part of the law's Decalogue. But achieving the objective can seem difficult. "Since the Tower of Babel, expression is inexact."[11] After all, "words are simply implements of communication, and imperfect ones at that. Oftentimes they cannot be assigned a rigid meaning, inherent in themselves. Rather, their meaning turns upon use, adaptation, and context as they are employed to fit various and varying situations."[12] In recognition of these truths,

> we have long allowed that words must be construed in the context in which they are used. Context is not, however, confined to the two-dimensional contractual environs in which the words exist but may also encompass the circumstances present when the contract was entered. This is so because words are the skin of a living thought, and our quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.[13]

Contractual text is not ambiguous *in a legal sense* merely because

---

[10] *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018).

[11] *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 582 (Tex. 2014) (Hecht, C.J., dissenting); *see also Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 445-446 (Tex. 2009) (Hecht, J., concurring); *cf.* GENESIS 11:1-9.

[12] *URI*, 543 S.W.3d at 764 (quoting *Cal. Dep't of Mental Hygiene v. Bank of Sw. Nat'l Ass'n*, 354 S.W.2d 576, 579 (Tex. 1962)).

[13] *Id.* (quotation marks omitted) (footnotes omitted) (quoting *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589; *Towne v. Eisner*, 245 U.S. 418, 425 (1918)).

it is unclear[14] and certainly not because the parties disagree about how to interpret it. The latter is irrelevant;[15] after all, issues of intent and proper interpretation arise only when there is disagreement. Disagreement over the meaning of a contract does not mean that it is ambiguous, legally. Lack of clarity is commonplace. Not every unclear text is legally ambiguous. Despite the deficits inherent in the use of language, "[w]henever possible, courts must assess adverse arguments and resolve a text's meaning as a matter of law."[16]

We have often stated that if contractual text "is subject to two or more reasonable interpretations, it is ambiguous."[17] That statement should not suggest that the dichotomy between reasonable and unreasonable is merely semantic. Chief Justice Calvert first announced the rule for the Court in 1951:

> a contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it *genuinely uncertain* which one of two or more meanings is the proper meaning. . . . In other words, if after applying established rules of interpretation to the contract it remains reasonably susceptible to more

---

[14] *Universal C. I. T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951) (stating that "'ambiguous' and 'ambiguity' . . . are often used to denote a simple lack of clarity in language but that is not the sense in which we use them [for determining whether instruments are ambiguous]").

[15] *See, e.g.*, *U.S. Polyco*, 681 S.W.3d at 385 (stating that "parties' 'disagreement' about [contract words'] intent is irrelevant to whether that text is ambiguous"); *URI*, 543 S.W.3d at 763 ("A contract is not ambiguous merely because the parties disagree about its meaning . . . .").

[16] *U.S. Polyco*, 681 S.W.3d at 389.

[17] *See, e.g.*, *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)).

9

than one meaning it is ambiguous, but if only one reasonable meaning *clearly emerges* it is not ambiguous.[18] The interpreting court must decide whether the meaning of the text read in context is genuinely uncertain or whether one reasonable meaning clearly emerges.

A recent decision of the United States Supreme Court, *Pulsifer v. United States*,[19] illustrates the point well.

> The "safety valve" provision of federal sentencing law exempts certain defendants from mandatory minimum penalties, thus enabling courts to give them lighter prison terms. To qualify for safety-valve relief, a defendant must meet various criteria, one of which addresses his criminal history. That criterion, in stylized form, requires that a defendant "does not have A, B, and C"—where A, B, and C refer to three ways in which past criminality may suggest future dangerousness and therefore warrant a more severe sentence.[20]

In the abstract, the phrase "does not have A, B, and C" can have virtually opposite meanings. It could mean that a qualifying defendant doesn't have A, doesn't have B, and doesn't have C—a checklist. A defendant with any one of the three doesn't qualify, making the qualifying criteria for the safety valve very stringent.

But the phrase could also mean that a defendant qualifies as long as he doesn't have the combination of A, B, and C—all three—making the safety valve more easily available. Both readings are grammatically correct, and each would readily be understood to be the intended

---

[18] *Universal C. I. T.*, 243 S.W.2d at 157 (emphases added).

[19] 144 S. Ct. 718 (2024).

[20] *Id.* at 723.

10

meaning in various contexts. The Court gives this example: don't (A) drink and (B) drive means don't do them both together; don't (A) eat and (B) drink before surgery means don't do either one at all.[21] It gives many more.

Words aren't ambiguous merely because they can be read differently in the abstract. They must be read in context, another fundamental rule. As the Court states, the choice between the two possible meanings "can sensibly be made only . . . by reviewing text in context."[22] Analyzing the federal sentencing guidelines,[23] the Court reasoned that requiring A, B, and C, each, provides a safety valve for otherwise stricter sentences, while requiring only one or two of the three would allow more violent criminals to be released sooner and seriously rupture the sentencing system. Thus, the Court held that the safety valve was available only for a defendant meeting each of the three requirements.

Another rule is that words be read together so that none is rendered meaningless. Our decision in *Universal C. I. T. Credit Corp. v.*

---

[21] *Id.* at 727-728.

[22] *Id.* at 726.

[23] As the Court explained, "[i]n general, the severity of Guidelines sentencing recommendations increases with the number of criminal-history points the defendant has (often called his criminal-history score). And the Guidelines assign more points to more serious prior offenses." *Id.* at 724. One qualification for the safety valve is that a defendant not have (A) more than 4 criminal history points, (B) a prior 3-point offense, and (C) a prior 2-point violent offense. 18 U.S.C. § 3553(f)(1). Pulsifer had been convicted of two 3-point offenses, so he failed to satisfy (A) and (B). *Pulsifer*, 144 S. Ct. at 724-725. But because he hadn't been convicted of a 2-point offense, he argued that he qualified for the safety valve since he hadn't failed to meet (A), (B), and (C), together. *Id.*

11

*Daniel* provides the classic example.[24] A car dealer sold its buyers' notes to a credit company. The dealer agreed, however, that it would repurchase certain vehicles repossessed by the credit company. The contract provided that the dealer would endorse the notes to be with recourse on certain types of vehicles but without recourse on others. It further stated that "in such cases", the credit company would "make any necessary correction in [the] endorsement and [the dealer's repurchase obligation] shall not apply."[25] The contract left unclear whether "such cases" were endorsements with recourse or those without.[26]

Read grammatically and standing alone, the phrase could apply to both types of endorsements. But if so, the dealer's repurchase obligation would never apply because all the endorsements were either with or without recourse. We rejected that interpretation because it would "render [the repurchase obligation] meaningless and . . . read [it] out of the contract entirely."[27]

To construe the phrase, we instead examined the parties' contract in their business context. The contract could be read to authorize the credit company to "correct" the dealer's non-recourse endorsement on a note to make it with full recourse, thereby unilaterally changing the dealer's liability. "Surely the parties had no such intent", we said, reflecting our conclusion that in the circumstances, the interpretation

---

[24] 243 S.W.2d 154 (Tex. 1951).

[25] *Id.* at 156.

[26] *Id.* at 158.

[27] *Id.*

was unreasonable.[28]

And if an endorsement could be changed from non-recourse to recourse, giving the credit company the right to sue the dealer directly, the repurchase obligation would provide nothing. There would be no reason to excuse it. In our view, such an "interpretation [could] hardly be said to be reasonable."[29]

The only reasonable interpretation of the contract, we concluded, was that the credit company was authorized to correct an endorsement intended to be with recourse to show that it actually was with recourse, thereby assuring a direct remedy against the dealer and excusing the then-unnecessary repurchase obligation. That left the repurchase obligation as the credit company's remedy when an endorsement was without recourse and excused it when the credit company already had a direct remedy against the dealer.[30]

The teaching of these authorities is that in interpreting a contract, we ascertain and give effect to the parties' intent expressed in the text, read without rendering any portion meaningless, and not in the abstract but in the context in which the words appear and were written—the realities they were meant to address. A limited examination may yield reasonable, conflicting interpretations, but only when one interpretation does not clearly emerge as correct after a full examination is a contract ambiguous and the determination of its meaning left to a jury.

---

[28] *Id.*

[29] *Id.*

[30] *Id.* at 159.

## III

Applying these principles to this case, we begin where the court of appeals left off. Royalty provisions (b)(ii) and (b)(iii) of the parties' licensing agreement can both reasonably be read, separately and in the abstract, to apply to all three SNAP products. Subparagraph (b)(ii) applies to a product "to detect Lyme disease in combination with one other veterinary diagnostic test . . . (for example, but not limited to, a canine heartworm diagnostic test . . . )". All three SNAP products test for Lyme disease and heartworm. Subparagraph (b)(iii) applies to a product "to detect Lyme disease in combination with one or more veterinary diagnostic products . . . to detect tick-borne disease(s)." All three SNAP products test for Lyme disease and one or more other tickborne diseases.

But the analysis cannot end there. If (b)(ii) and (b)(iii) can both apply to all three SNAP products, then one or the other is meaningless surplusage and needn't have been included in the agreement. That interpretation is unreasonable because the two provisions call for very different royalty amounts: 1% (reduced to 0.5% when Tulane is also entitled to a royalty) and 2.5% (not reduced for Tulane's royalty). The parties couldn't have intended different royalty rates on the same product sales. So, we must examine the provisions more closely.

Subparagraph (b)(ii) renders (b)(iii) meaningless only if "one" means *one or more* or *at least one*. If "one" means *only one*, then (b)(ii) applies only to a product with two tests—for Lyme disease and one other. The three SNAP products all include more than two tests. Subparagraph (b)(iii) applies to products with more than two tests.

Reading "one" restrictively keeps (b)(ii) from making (b)(iii) surplusage. Also, (b)(iii)'s "one or more" and paragraph 2.1's "at least one" indicate that when the parties didn't intend "one" to mean *only one*, they said so expressly.

Labs argues that the term "other" in (b)(ii) means "non-tickborne". This, Labs continues, suggests that the phrase "not limited to . . . canine heartworm" means that the "one" other test of (b)(ii) can be tickborne, since heartworm, the given example, is a mosquito-borne disease. Were that reading adopted, Labs argues, "one other" wouldn't foreclose the inclusion of tickborne tests, and (b)(ii) wouldn't be limited to two products.

But that reading again allows (b)(ii) to render (b)(iii) superfluous and is a self-defeating argument. If "one other" indeed refers to tests that detect non-tickborne diseases, then that's another reason (b)(ii) shouldn't apply, since each SNAP product detects multiple tickborne diseases. Labs' insistence that "other" literally means "non-tickborne" also results in the nonsensical phrase, "one non-tickborne veterinary diagnostic test or service". It's safe to conclude that the parties didn't need to specify that Labs' veterinary diagnostic tests and services weren't being delivered or administered *by* ticks. Finally, like "one other", "one non-tickborne" can be read restrictively, so Labs' argument does little to move the ball forward.

However, a broad reading of "one other" in (b)(ii) wouldn't render (b)(iii) meaningless if (b)(iii) applies only to products with tests for tickborne diseases—if it's what Labs calls a tick panel. All three SNAP products contain tests for heartworm, so (b)(iii), while not surplusage,

15

wouldn't apply. And (b)(ii) would apply if "one other" doesn't limit the inclusion of tests for tickborne diseases, which all the products have.

But a tick panel was not part of the disease-testing market that led to the licensing agreement. To the contrary, the market forces prompting Labs to license the testing process for Lyme disease from the University and Tulane were pushing Labs to add to its successful SNAP heartworm test and differentiate it from competing tests, not to substitute for the heartworm test altogether.[31]

On the other side, the University's reading of (b)(ii)'s "one other" restrictively to mean *only one* is in some tension with its non-restrictive reading of (b)(iii) to include heartworm though not mentioned and not a tickborne disease. But again, Labs' market reasons for licensing the Lyme testing process, as discussed thoroughly with the University, were to supplement the SNAP heartworm tests, not supplant them.

Labs argues that the royalty provisions aren't comprehensive and don't cover products that might have been developed, such as one testing for Lyme disease, heartworm, and one or more other non-tickborne diseases. But Labs points to no rule that a contract be comprehensive to be unambiguous. To the contrary, it would be unreasonable to require parties, negotiating for particular situations, to provide for others beyond their scope of interest.

Looking to the industry market for which the SNAP products were developed, Labs argues that it makes no sense for the University

---

[31] The market forces to which we refer here and below are the "objectively determinable facts and circumstances that contextualize the parties' transaction", not "extrinsic evidence of [the parties'] subjective intent". *URI*, 543 S.W.3d at 758, 767.

to agree to a lower (b)(ii) royalty on a product containing only its Lyme disease test and Labs' heartworm test (or potentially a different type of test) but then insist on a much higher (b)(iii) royalty on a product containing its Lyme disease test, Labs' heartworm test, and several other tests for tickborne diseases. The royalty should be higher, Labs argues, when the University's test is just one of two components in a product rather than when its role is watered down by inclusion among several others. The University counters that the inclusion of its Lyme disease test with Labs' heartworm test differentiated Labs' SNAP products from competitors and increased sales but also made possible further diversification and greater profitability with the inclusion of yet more tests for tickborne diseases, justifying a higher royalty. Even though the Lyme test was a smaller component of a product covered by (b)(iii), the University argues, it was responsible for driving greater profits.

The context surrounding the parties' agreement favors the University's reading; a restrictive reading of "one other" is closest to the mark. The most natural reading of "one other" is *only* one other, especially when the only alternative, *one or more*, results in the problems discussed. As described, the product covered by (b)(ii) has exactly two components, which test for Lyme disease and heartworm respectively (although the heartworm component can be swapped out for a component that tests for a different disease).

And notably, at the time the parties were negotiating, that product description mirrored the format of an extant Labs product, the Snap Canine Combo. The Snap Canine Combo tested for a tickborne

17

disease, *E. canis*, and only one other disease, heartworm. Subparagraph (b)(ii) would cover a similar product, which tested for Lyme disease and heartworm (or one other disease), and nothing else. However, it appears that Labs soon determined that it would be more lucrative to create products that test for heartworm and multiple tickborne diseases, i.e., in a "tick panel format", as evinced by Labs' continuing to release products that tested for an increasing number of tickborne diseases.

Significantly, as *Pulsifer* reminds us, this reading gives "operative significance" to all the provisions and ensures that "[e]ach . . . does independent work".[32] Subparagraph (b)(i) applies to products that test for Lyme disease alone;[33] (b)(ii) was intended to apply to a contemplated product similar to the SNAP Canine Combo, which was ultimately never produced; and (b)(iii) applies to each of the disputed SNAP products.

Reading the royalty provisions together, not separately, giving meaning to all, and considering them in the context of the licensing agreement itself and the objective circumstances in which the license agreement was produced, we conclude that the provisions are most reasonably interpreted to require royalties on SNAP products at the higher (b)(iii) rate.

Labs argues that the University shouldn't be allowed to accept royalties at the lower rate for more than 13 years, throughout the life of the licensing agreement, and then after the agreement ended complain for the first time that royalties were due at the higher rate. Labs reported to the University—in detail, every quarter, for each SNAP

---

[32] 144 S. Ct. at 731.

[33] *See supra* note 7.

18

product—the sales, royalty rates, and amounts paid. The University doesn't claim to have misunderstood or been misled. It claims only that it was unaware of an issue that Labs purportedly recognized and didn't raise. Labs has defenses to the University's claim that the court of appeals must address on remand.

*    *    *    *    *

Accordingly, the court of appeals' judgment is reversed, and the case is remanded to that court for further proceedings.

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 14, 2024